IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JEREMY JOSEPH SMITH, | ) | CASE NO. 3:21-CV-02310-JRK |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP II |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| KILOLO KIJAKAZI, | ) | JENNIFER DOWDELL |
| ACTING COMMISSIONER OF | ) | ARMSTRONG |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.  INTRODUCTION

Plaintiff Jeremy Joseph Smith ("Mr. Smith") seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). (*See* ECF non-document entry dated September 2, 2022). For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.  PROCEDURAL HISTORY

On August 4, 2017, Mr. Smith applied for DIB and SSI. (Tr. 371, 373). Mr. Smith's applications related to his neuropathy and a broken right foot. (Tr. 409).

The Social Security Administration ("SSA") denied Mr. Smith's applications initially and upon reconsideration. (Tr. 154, 190). Mr. Smith requested a hearing before an administrative law judge ("ALJ"). (Tr. 248). The ALJ held a hearing on February 22, 2019, at which Mr. Smith was represented by counsel. (Tr. 74). Mr. Smith testified, as did an impartial vocational expert ("VE").

1

On May 7, 2019, the ALJ issued a written decision, finding that Mr. Smith was not disabled. (Tr. 192). On July 29, 2020, the Appeals Council remanded the case back to the ALJ for further consideration of whether Mr. Smith could perform jobs that exist in significant numbers in the national economy given Mr. Smith's assessed limitations. (Tr. 224).

On November 24, 2020, a second ALJ held a telephonic hearing, at which Mr. Smith was represented by counsel. (Tr. 41). Mr. Smith testified, as did the VE. On December 17, 2020, the ALJ issued a written decision finding that Mr. Smith was not disabled. (Tr. 12). The ALJ's decision became final on October 15, 2021, when the Appeals Council declined further review. (Tr. 1).

On December 9, 2021, Mr. Smith filed his complaint, challenging the Commissioner's final decision. (ECF Doc. No. 1). Mr. Smith asserts the following assignments of error:

(1)    The ALJ failed to evaluate the evidence regarding Plaintiff's peripheral neuropathy, compare such evidence to the requirements of Listing 11.14, and failed to provide an explained conclusion with respect to Listing 11.14.

(2)    The ALJ failed to properly weigh the evaluations and opinions of the Plaintiff's treating physicians and care providers.

(ECF Doc. No. 11, PageID # 3168).

## III.    BACKGROUND

### A.    <u>Personal, Educational, and Vocational Experience</u>

Mr. Smith was born in March of 1976 and was 39 years old on the alleged onset date. (Tr. 49, 122). Mr. Smith has never married. (Tr. 49). He has adult two children. (Tr. 49-50). Mr. Smith graduated from high school. (Tr. 50). He has prior work as a construction worker, a rubber goods finisher, and a welder. (Tr. 52-53).

### B.    <u>Relevant Hearing Testimony</u>

#### *1.    **Mr. Smith's Testimony***

Mr. Smith testified that he had not worked since approximately 2016. (Tr. 52). Mr. Smith

testified that he was previously employed as a construction worker from 2005 to 2016. *Id*.

With respect to his peripheral neuropathy, Mr. Smith testified that he cannot walk very far, but that he could walk to the library from his apartment approximately six months ago. (Tr. 59). Mr. Smith also testified that he could stand for approximately an hour, and that he could sit for about the same amount of time. *Id*. Mr. Smith testified that he could only pick up and carry light objects, and that he was not sure how far he could carry a gallon of milk. (Tr. 60). Mr. Smith testified that he uses a cane everywhere he goes. *Id*. Mr. Smith also testified that he can shower by himself, but that he has to sit in a chair to do so. *Id*. Mr. Smith further testified that he can dress himself, but that he cannot put on a pair of pants or underwear without leaning against the wall. *Id*. Mr. Smith testified that he can make food for himself, do the dishes, do laundry, and go to the grocery store. (Tr. 60-61).

In response to questioning by his counsel, Mr. Smith testified that he has numbness in his feet and legs below the knees, and that the pain had gotten worse since his prior administrative hearing. (Tr. 61). Mr. Smith testified that he takes gabapentin, which helps with the pain. (Tr. 62). Mr. Smith also testified that he cannot stand up without his cane or without leaning against a chair. *Id*. Mr. Smith also testified that he was told to use a cane all the time in 2015 or 2016, but that Mr. Smith was stubborn and did not do so. *Id*. Mr. Smith testified that, as a result, he fell a number of times, and that he has fallen even with the cane. *Id*. Mr. Smith also testified that the last time he fell was approximately a year prior, and that he had to go to the hospital as a result. *Id*.

### 2.     *Vocational Expert's Testimony*

In response to a hypothetical question from the ALJ, the VE testified that a hypothetical individual with Mr. Smith's characteristics and limitations could not perform any of Mr. Smith's past work. (Tr. 65). The ALJ also testified, however, that such an individual could perform work as a table worker inspector, document preparer, or hand mounter. (Tr. 67). In response to a question

from Mr. Smith's counsel, the VE testified that the hypothetical individual's ability to perform those jobs would not be affected if the individual needed to use a cane for ambulation and balance and could only carry objects weighing less than ten pounds in the individual's free hand. (Tr. 70).

### C.    Relevant Opinion Evidence[1]

#### 1.    *Jatinder Patti, M.D.*

Dr. Patti was a treating neurologist of Mr. Smith. On July 23, 2020, Dr. Patti prepared a letter, opining that Mr. Smith's neuropathy had caused him to experience balance problems and an unsteady gait, placing him at an increased risk for falls. (Tr. 2990). Dr. Patti also opined that Mr. Smith's neuropathy had decreased his ability to function safely in a workplace environment. *Id*. Dr. Patti expressed the opinion that Mr. Smith was unable to work due to his neuropathy, balance problems, and unsteady gait. *Id*.

The ALJ found that Dr. Patti's opinion was "inherently neither valuable nor persuasive" because it was conclusory and did not "contain any functional analysis or objective support." (Tr. 27). The ALJ also stated that Mr. Smith had an appointment contemporaneous with the date of Dr. Patti's letter, at which Mr. Smith was able to walk unassisted, had 5/5 motor strength throughout, and had intact sensation. *Id*. The ALJ further stated that, in an office note from a July 2020 visit, Dr. Patti opined that Mr. Smith should not do work involving prolonged standing without assistance or near heights, sharp objects, or heat. *Id*. The ALJ found those limitations appropriate and stated that they had been provided for in Mr. Smith's residual functional capacity. *Id*.

#### 2.    *Kristin Martin, APRN-CNP*

Kristin Martin was a treating nurse practitioner of Mr. Smith. On January 12, 2017, Nurse Martin prepared a letter, opining that Mr. Smith was unable to work due to his current health status,

---

[1] While the ALJ determined that Mr. Smith suffers from a number of severe impairments, Mr. Smith challenges only the ALJ's treatment of his peripheral neuropathy and the medical opinion evidence relating to his peripheral neuropathy. Therefore, this Report and Recommendation does not discuss medical evidence relating to any other condition.

including alcoholic neuropathy, anxiety, and unsteady gait. (Tr. 998). Nurse Martin prepared a second letter on September 18, 2017 reiterating those opinions. (Tr. 1566). On March 26, 2020, Nurse Martin prepared a third letter, stating that Mr. Smith displayed a great deal of dysfunction, including severe limitations in his functional mobility. (Tr. 2832). The letter also stated that Mr. Smith's balance and increased fall risk continued to decrease his ability to function in a productive or safe workplace environment. *Id*. Nurse Martin again concluded that Mr. Smith was not employable due to his neuropathy, anxiety, and unsteady gait. *Id*.

The ALJ found that Nurse Martin's opinions were "inherently neither valuable nor persuasive" because they were conclusory and "did not contain any functional analysis or objective support." (Tr. 27).

### 3. *Larry Adolph, PT, DPT*

Mr. Adolph performed a functional capacity evaluation of Mr. Smith on August 21, 2018. (Tr. 2392-2396). Mr. Adolph opined that Mr. Smith suffered from significant dysfunction secondary to alcohol-induced peripheral neuropathy. (Tr. 2392). Mr. Adolph stated that Mr. Smith ambulated using a straight cane, demonstrating primarily an ataxic gait pattern with some sensory (gait) type characteristics. *Id*. Mr. Adolph also noted that Mr. Smith was unable to perform heel-to-toe walking safely. *Id*. Mr. Adolph further noted that Mr. Smith could stand on his right leg for .86 seconds and his left leg for 1.2 seconds, compared to 30 seconds for a normal individual. *Id*. He also noted that Mr. Smith was unable to stand normally on both feet with his eyes closed without falling backwards. *Id*. Mr. Adolph further noted that Mr. Smith completed a timed up and go test in 20.10 seconds with a cane and 21.36 seconds without a cane, while adults without balance problems can complete the test in fewer than 10 seconds. *Id*. Mr. Adolph also noted that Mr. Smith reported approximately one fall per month and multiple near falls daily. *Id*.

Mr. Adolph opined that Mr. Smith could sit without interruption, but that after sitting for

more than 30 minutes it was very difficult for Mr. Smith to rise and get his legs moving. *Id*. Mr. Adolph also opined that Mr. Smith could stand for up to 30 minutes at a time with support, for a total of one hour per workday. *Id*. Mr. Adolph further opined that Mr. Smith could walk up to 200 feet at a time with a straight cane, for a total of 1,000 feet per workday. *Id*. Mr. Adolph opined that Mr. Smith's use a cane was medically necessary, and that Mr. Smith could carry very small, safe objects of nominal weight while using a cane. *Id*.

Mr. Adolph concluded that Mr. Smith displayed significant dysfunction. (Tr. 2393). Mr. Adolph opined that Mr. Smith has severe limitations in functional mobility and balance, which, when combined with Mr. Smith's fall risk, would continue to impede Mr. Smith's ability to function productively and/or safely in any type of work environment or dynamic community environment. *Id*. Mr. Adolph opined that Mr. Smith is "currently not employable in my opinion." *Id*.

The ALJ stated that she found the functional capacity analysis of Mr. Adolph "unpersuasive" because Mr. Adolph's statement that Mr. Smith was "unemployable" was a determination reserved to the Commissioner, because the evaluation did not reveal the clinical abnormalities one would expect from Mr. Adolph's evaluation, and because Mr. Adolph's evaluation was "not entirely consistent" with the totality of the evidence. (Tr. 27).

### 4.    *Drs. Linda Hall, M.D. and Rannie Amiri, M.D.*

Dr. Hall, a state agency medical examiner, reviewed Mr. Smith's records on November 6, 2017. (Tr. 128-133). Dr. Hall noted that Mr. Smith reported neuropathy and did have decreased sensation upon examination. (Tr. 131). Dr. Hall opined that Mr. Smith could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand, walk, or sit for approximately six hours in an eight-hour workday, and frequently push and pull with his lower extremities in light of his neuropathy. (Tr. 131-32). Dr. Hall further opined that Mr. Smith could never climb ladders, ropes,

or scaffolds, but that he did not have other postural limitations. (Tr. 132). On January 1, 2018, Dr. Amiri, a second state agency medical examiner, largely concurred in those findings upon reconsideration, but found that Mr. Smith could only occasionally crawl or stoop. (Tr. 162-68).

The ALJ found that the state agency medical examiners' opinions were "only somewhat persuasive" because additional evidence submitted after the state agency medical examiners rendered their opinions demonstrated that Mr. Smith was more limited than reflected in those opinions. (Tr. 26-27). The ALJ stated that additional limitations were appropriate based on that additional evidence. (Tr. 27).

### D. **Relevant Medical Evidence**

On August 2, 2016, Mr. Smith saw Nurse Martin. (Tr. 1009). Mr. Smith reported pain and numbness in his lower extremities, which he stated had been going for at least six months and getting progressively worse. (Tr. 1011). Mr. Smith's gait was slow but normal. (Tr. 1012). Nurse Martin strongly recommended that Mr. Smith visit the emergency room, which Mr. Smith declined to do. (Tr. 1013).

Mr. Smith was hospitalized on August 4, 2016, complaining of numbness and weakness in his legs for the past six months. (Tr. 799). Mr. Smith reported that his balance was poor and that he had been falling. *Id*. An MRI of Mr. Smith's spine showed mild central canal stenosis at L5-S1 without spinal cord compression. *Id*. It was noted that Mr. Smith had numbness and weakness bilaterally feet to knees. *Id*. Mr. Smith had normal range of motion, no swelling, and no deformity. (Tr. 802). Mr. Smith admitted to drinking alcohol daily, and the treating physician stated that Mr. Smith likely had alcohol-related neuropathy. (Tr. 804). It was also noted that Mr. Smith had been walking with a walker. (Tr. 836). An examination found that his motor strength was 5/5. (Tr. 837). However, it was also noted that Mr. Smith was "very shaky" with all mobility and that his movement was ataxic. (Tr. 853).

Following his discharge, Mr. Smith received occupational therapy. (Tr. 888). Mr. Smith's motor control and sensation in his lower extremities was impaired. (Tr. 889). Mr. Smith needed a rolling walker and moderate assistance to walk 15 feet safely. (Tr. 893). Upon completing occupational therapy, Mr. Smith's treatment notes reflect that he showed gains in functional strength and balance which allowed for improvements in gait and transfers. (Tr. 898).

Mr. Smith was admitted to the hospital again on August 31, 2016, stating that he was getting weaker and weaker and kept falling. (Tr. 1102). Mr. Smith's father also reported that Mr. Smith had been walking with a cane. *Id*. On September 12, 2016, Mr. Smith was admitted to the hospital for alcohol withdrawal. (Tr. 954). Mr. Smith had an unsteady gait and reported shooting pain, tingling pain, and weakness in both legs. (Tr. 975). It was noted that Mr. Smith normally ambulated with a cane. (Tr. 976).

On September 20, 2016, Mr. Smith saw Nurse Martin for a follow-up visit following his hospital stay. (Tr. 1004). Mr. Smith's chief complaint was numbness in his feet, and he reported that his balance was off following his discharge. (Tr. 1006). On January 12, 2017, Mr. Smith saw Nurse Martin again following a recent hospitalization after a car accident. (Tr. 987). Mr. Smith was walking with a walker. (Tr. 988). His gait was unsteady, and a nurse walked him safely to his room. *Id*. Mr. Smith exhibited decreased strength in his lower extremities. *Id*.

Between February and December 2017, Mr. Smith saw Nurse Martin for additional follow-up visits. (Tr. 993-1003, 1584-92). Mr. Smith exhibited a slow, steady gait, and was using a cane on some occasions but not others. (Tr. 998, 1002, 1587). Nurse Martin noted that Mr. Smith continued to have pain, numbness, and tingling. (Tr. 993). However, Mr. Smith reported that his legs were feeling better than previously, he was no longer walking with a walker, and he did not believe he needed a cane. *Id*. Mr. Smith reported that he had been walking to his father's house, which took him about 40 minutes without a cane. (Tr. 1001).

8

In June 2017, Mr. Smith was again admitted to the hospital because of mental status changes and hallucinations. (Tr. 1026). He was able to walk several steps with a walker with assistance. *Id*. In June and July 2017, Mr. Smith received physical therapy. (Tr. 1548-55). Mr. Smith presented with declines in strength, balance, and coordination, and an increased need for assistance. (Tr. 1551). Mr. Smith's strength in both lower extremities was impaired. (Tr. 1553). His sitting balance was assessed as fair, his static standing balance at fair-, and his dynamic standing at poor+. *Id*. Mr. Smith moved with a two-wheeled walker, and exhibited decreased cadence, decreased step length, discontinuous steps, deficits during turning, a narrow base of support, and shuffling gait. (Tr. 1554). During therapy, Mr. Smith made steady progress with increasing lower extremity and core strength, increased balance, and increased endurance in ambulating. (Tr. 1557).

From July to October 2017, Mr. Smith received treatment from Dr. Merrill L. Gladden for a fracture in his left foot. (Tr. 1571, 2313-18). Dr. Gladden reported that Mr. Smith was experiencing no significant pain in the fracture site, but that Mr. Smith was continuing to have pain secondary to his neuropathy in both lower extremities. (Tr. 1571). Dr. Gladden also noted that Mr. Smith was "ambulating well" in regular shoes. *Id*.

On July 5, 2017, Mr. Smith presented with peripheral neuropathy to Dr. Anibal Lugo. (Tr. 2350). Mr. Smith reported progressive pain and tingling in his feet, numbness that had ascended to his knees, and a high degree of imbalance when walking. *Id*. Mr. Smith was assessed having a decreased sensation in a stocking distribution to approximately the knees bilaterally. (Tr. 2352). Dr. Lugo noted that Mr. Smith's gait was abnormal due to his left foot being in a wrap. *Id*. However, Dr. Lugo also noted that it was apparent Mr. Smith had a wide based ataxic gait at baseline. *Id*. Dr. Lugo also stated that Mr. Smith's neurologic exam was notable for length dependent large and small fiber peripheral neuropathy, most likely caused by alcohol abuse. *Id*.

Mr. Smith saw Dr. Lugo again in March 2018, and Dr. Lugo's evaluation was essentially the same at that time. (Tr. 2346).

On December 20, 2017, Mr. Smith saw Dr. Patti. (Tr. 1601). Mr. Smith's sensation was intact to light touch, temperature, vibration, and joint position sense. *Id*. Dr. Patti also noted that Mr. Smith was able to walk unassisted, could walk on his toes and heels, and could tandem walk. *Id*.

In March 2018, Mr. Smith again saw Nurse Martin. (Tr. 2356-61). Mr. Smith reported that his peripheral neuropathy was roughly the same, that he remained unsteady on his feet, and that he was using a cane for balance. (Tr. 2356). He was walking with a slow, steady gait with the assistance of a cane. (Tr. 2357). Mr. Smith asked about getting a job, but Nurse Martin advised that it would not a good idea given Mr. Smith's neuropathy, unsteadiness, and anxiety. *Id*. From June 2018 to January 2019, Mr. Smith saw Nurse Martin on several occasions. (Tr. 2370, 2414, 2426, 2441, 2498, 2506).  Mr. Smith continued to walk with a slow, steady gait with the assistance of a cane. (Tr. 2415, 2426, 2499, 2507). Nurse Martin recommended that Mr. Smith consider physical therapy again given his continued unsteady gait. (Tr. 2507).

On April 26, 2018, Mr. Smith again saw Dr. Patti. (Tr. 2380). Mr. Smith reported that he had to sit down to take a shower and that he could not maintain balance with his eyes closed. *Id*. Mr. Smith's sensation was intact with reduced sensation to temperature to the level of the bilateral knee and to vibration to the level of the ankles. (Tr. 2381). Mr. Smith was able to walk unassisted but could not walk on his toes or heels or tandem walk. *Id*.  Dr. Patti reported that he had advised Mr. Smith his neuropathy was irreversible, and that no medication could bring sensation back. *Id*.

On July 26, 2018, Mr. Smith saw Dr. Patti again. (Tr. 2370). Dr. Patti reported that Mr. Smith continued to have issues with his gait and balance, especially with his eyes closed in the dark. *Id*. Mr. Smith's sensation was intact with reduced sensation to temperature to the level of the

bilateral knee and to vibration to the level of the ankles. (Tr. 2371). Mr. Smith was able to walk unassisted but could not walk on his toes or heels or tandem walk. *Id*. On July 25, 2019, Mr. Smith saw Dr. Patti for a follow-up visit. (Tr. 3028). Mr. Smith denied any progression of his neuropathy since his prior visit. *Id*. Dr. Patti also noted that Mr. Smith continued to use a cane as a baseline. *Id*. Mr. Smith denied any falls or near falls for many months. *Id*.

On November 10, 2019, Mr. Smith was admitted to the hospital, complaining of generalized weakness, bilateral knee pain, and falls at home. (Tr. 2658). Mr. Smith stated that he had been falling for six to twelve months, and that he used a cane to walk. *Id*. An MRI revealed moderate degenerative changes of the lumbar spine with degenerative disc disease L5-S1. (Tr. 2666). Mr. Smith had good range of motion. (Tr. 2672). Following his discharge, Mr. Smith received occupational therapy. (Tr. 2798). The therapist noted that Mr. Smith lived alone and used a straight cane for mobility. *Id*. Mr. Smith could stand with minimal assistance but was unable to shift his weight and was at a high risk of falling. *Id*. Mr. Smith's sensation in his lower extremities was impaired, but he had normal muscle tone and intact motor coordination. (Tr. 2810).

On June 15, 2020, Mr. Smith visited Blanchard Valley Orthopedic & Sports Medicine with complaints of left hip and back numbness. (Tr. 3002). It was noted that Mr. Smith ambulated with a cane. *Id*. Mr. Smith's sensation was intact to the lower extremities, he had 5/5 strength in both legs, and a normal gait. (Tr. 3003-04). Mr. Smith visited again on July 13, 2020, and was again assessed as having 5/5 strength, sensation intact to the lower extremities, and a normal gait. (Tr. 2998-99).

Between January 2019 and October 2020, Mr. Smith received outpatient counseling at Harbor Behavioral Health. (Tr. 2833-2989, 3035-68, 3096). On June 14, 2019, Mr. Smith reported that he wanted to work, but that his lawyer had advised him not to because Mr. Smith was appealing his disability determination. (Tr. 2848). On October 8, 2019, Mr. Smith asked his

therapist how much he could work without affecting his Medicaid and disability claim. (Tr. 2879). On November 5, 2019, Mr. Smith reported that he had applied for jobs within walking distance, including at a factory, a gas station, and a Dollar General. (Tr. 2883). On February 13, 2020, Mr. Smith asked his therapist whether he could work given his benefits and disability insurance. (Tr. 2921). On February 21, 2020, Mr. Smith again expressed concern to his therapist about how a job would impact his benefits. (Tr. 2928). Mr. Smith's therapist advised him to weigh the gains of working against the loss of benefits. *Id*. Mr. Smith determined that he did not want to move forward with career services until he had his social security disability hearing. *Id*. On March 30, 2020, Mr. Smith reported that he may have found employment through a friend's lawn care job, but that he was unable to secure a ride for the job. (Tr. 2940). Mr. Smith's therapist cautioned Mr. Smith about staying within certain hours to keep his benefits. *Id*. Mr. Smith responded that he would "rather just work under the table." *Id*.

## IV. THE ALJ'S DECISION

The ALJ first determined that Mr. Smith met the insured status requirements of the Social Security Act through December 31, 2020. (Tr. 17). The ALJ further determined that Mr. Smith had not been engaged in any gainful activity since November 15, 2015, the alleged onset date of his disability. *Id*.

The ALJ next determined that Mr. Smith had the following severe impairments: alcohol dependence and abuse, alcoholic polyneuropathy, lumbar degenerative changes, trochanteric bursitis and osteoarthritis of the left hip, depression, and anxiety. *Id*. The ALJ found, however, that none of Mr. Smith's severe impairments, whether singly or in combination, met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18). In making that determination, the ALJ did not consider whether Mr. Smith's polyneuropathy met or medically equaled Listing 11.14 (peripheral neuropathy).

The ALJ next determined that Mr. Smith had the residual functional capacity ("RFC") to:

> perform sedentary work as defined in 20 CFR 404.1567(a) and
> 416.967(a) except: occasionally climb ramps and stairs; never climb
> ladders, ropes, or scaffolds; occasionally balance and stoop; never kneel,
> crouch, or crawl; and never operate foot controls with the bilateral lower
> extremities. He requires the use of an assistive device (cane) to ambulate.
> He can never be exposed to concentrated levels of extreme heat, extreme
> cold, humidity, wetness, vibrations, fumes, odors, dusts, gases, other
> pulmonary irritants; be exposed to hazards such as moving machinery
> and unprotected heights; or operate a motor vehicle commercially. He is
> limited to performing work that requires no more than frequent near
> vision (so, for example, no threading of needles or reading print smaller
> than that of an ordinary newspaper). He can perform simple, routine, and
> repetitive tasks, but not at a production rate pace (so, for example no
> assembly line work), and is limited to making simple, work-related
> decisions. He can respond appropriately to occasional interaction with
> supervisors and co-workers, but should not engage in any team or tandem
> work with co-workers and should not interact with the general public. He
> is limited to tolerating few changes in the work setting, defined as routine
> job duties that remain static and are performed in a stable, predictable
> work environment where any necessary changes occur infrequently and
> be adequately and can be easily explained.

(Tr. 20-21).

With respect to opinions from medical sources, the ALJ stated that she could not "defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources." (Tr. 26.) The ALJ also stated that she had "fully considered the medical opinions and prior administrative medical findings . . . ." *Id*.

The ALJ next found that Mr. Smith was unable to perform any past relevant work. (Tr. 28). However, the ALJ also found that Mr. Smith could perform jobs that exist in significant numbers in the national economy, including inspector, document preparer, and hand mounter. (Tr. 29). Accordingly, the ALJ determined that Mr. Smith was not disabled. (Tr. 30).

## V.      LAW & ANALYSIS

### A.    Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation omitted). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B. Standard for Disability

To establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a). A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.[2]

Consideration of disability claims follows a five-step review process. 20 C.F.R. §404.1520. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in some instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*e.g.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 404.1520(e) and 416.930(e). At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g). *See Abbott*, 905 F.2d at 923.

### C.  Analysis

Mr. Smith argues that the ALJ committed reversible error in two respects: (1) by failing to consider whether his peripheral neuropathy met or equaled Listing 11.14 at Step Three; and (2) by failing to properly weigh the opinions of Mr. Smith's treating sources. For the reasons set forth below, Mr. Smith's arguments are without merit.

#### 1.  The ALJ's Step Three Analysis

As Mr. Smith notes, "[a]n administrative law judge must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 (6th. Cir. 2011). If the impairment meets or equals a listing and satisfies the durational requirement, the ALJ must find that the claimant is disabled. *See Smith-Johnson v.*

*Comm'r of Soc. Sec.*, 579 F. App'x 426, 431 (6th Cir. 2014).

The ALJ here did not analyze whether Mr. Smith's peripheral neuropathy met or equaled Listing 11.14, the relevant listing for peripheral neuropathy. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.14. The Commissioner concedes that the ALJ erred by failing analyze Listing 11.14, but argues that the ALJ's error was harmless because Mr. Smith failed to demonstrate that his peripheral neuropathy satisfied the criteria of Listing 11.14. The Commissioner's argument is well-taken.

*Reynolds* "does not establish a bright line rule" that an ALJ commits reversible error by failing to address a listing. *Nelson v. Comm'r of Soc. Sec.*, No. 1:17-cv-2658, 2019 WL 1109338, at *2 (N.D. Ohio Mar. 8, 2019); *see also Sistrunk v. Comm'r of Soc. Sec.*, No. 1:17-cv-1771, 2018 WL 3126585, at *11 (N.D. Ohio June 26, 2018) ("Since *Reynolds*, the Sixth Circuit has expressly declined to adopt a blanket rule that remand is required whenever an ALJ provides minimal reasoning at Step Three of the sequential evaluation process."). Indeed, "neither the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.'" *Smith-Johnson*, 579 F. App'x at 432 (quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013)). Rather, an ALJ should discuss a listing "where the record raises 'a substantial question as to whether [the claimant] could qualify as disabled'" under that listing. *Id.* (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)); *see also Pasiak v. Comm'r of Soc. Sec.*, 800 F. App'x 301, 304 (6th Cir. 2019) ("to decide whether the ALJ erred in her cursory step-three analysis, we must determine whether the record raises a 'substantial question' as to whether Pasiak could qualify as disabled under one of the listings").

"A claimant must do more than point to evidence on which the ALJ could have based [a] finding to raise a 'substantial question' as to whether he has satisfied a listing." *Smith-Johnson*, 579 F. App'x at 432. "Rather, the claimant must point to specific evidence that demonstrates he

reasonably could meet or equal every requirement of the listing." *Id*. "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id*. at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (holding that ALJ's failure to properly evaluate listing at Step Three is harmless where claimant cannot show that impairments met or medically equaled listing); *Tate v. Berryhill*, No. 1:17CV1986, 2018 WL 3417308, at *13 (N.D. Ohio July 13, 2018) (holding that ALJ's failure to address listing was harmless where medical evidence did not establish that plaintiff's connective tissue disorder involved two or more body systems at moderate level of severity, as required by listing); *Abduhamdeh v. Saul*, No. 1:20-cv-954, 2021 WL 3375422, at *8 (N.D. Ohio July 16, 2021), *report and recommendation adopted sub nom*, 2021 WL 3371142 (holding that ALJ's error at Step Three was harmless where treatment records did not demonstrate that plaintiff could satisfy listing).

Listing 11.14 contains two separate paragraphs, paragraph A and paragraph B, and a claimant satisfies Listing 11.14 if the claimant meets the requirements for either paragraph. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.14. Paragraph A requires:

> Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.14A. Paragraph B requires a marked limitation in physical functioning plus a marked limitation in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace or adapting or managing oneself. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.14B. In his merits brief, Mr. Smith argues only that he has raised a substantial question with respect to the paragraph A criteria. (ECF Doc. No. 11, PageID #3181). Because Mr. Smith does not argue that he has raised a substantial question with respect to paragraph B, I will address only paragraph A.

It is undisputed that Mr. Smith has disorganization of motor function in both legs as a result

of his peripheral neuropathy. Mr. Smith argues that he has also demonstrated an extreme limitation in standing from a seated position or balancing while standing or walking.[3] Mr. Smith points to portions of his medical record reflecting that he had a wide-based, ataxic gait, difficulties with coordination, balance, and functional mobility, an inability to perform heel-and-toe walking, an inability to stand normally with his eyes closed, and appeared off balance despite using a cane. (ECF Doc. No. 11, PageID #3181-82).

Mr. Smith's argument overlooks the definition of an "extreme limitation" for purposes of Listing 11.14. Section 11.02D2 defines an extreme limitation as an inability to stand up or maintain balance "without the assistance of another person" or "an assistive device, such as a walker, two crutches, or *two* canes." *Id.* (emphasis added). Mr. Smith has not pointed to any evidence demonstrating that he is consistently unable to stand up or maintain balance without a walker, two crutches, or two canes. Instead, other than two periods where Mr. Smith used a walker while hospitalized in December 2016 and November 2019, Mr. Smith's testimony and medical records reflect that he makes use of a *single* cane. (Tr. 60, 62, 976, 2392, 3002).

As courts within this district have held on multiple occasions, "it is clear that use of a single cane, standing alone, is not sufficient to demonstrate disorganization of motor function in two extremities, resulting in an extreme limitation in either the ability to stand up from a seated position or the ability to balance while standing or walking . . . ." *Boone v. Kijakazi*, No. 1:21CV1453, 2023 WL 2153847, at *7 (N.D. Ohio Feb. 22, 2023); *see also Ash v. Comm'r of Soc. Sec. Admin.*, No. 5:21-CV-00526-PAB, 2022 WL 18863848, at *13 (N.D. Ohio Dec. 28, 2022), *report and recommendation adopted sub nom*, 2023 WL 2153853 (holding that plaintiff's "alleged use of a single cane cannot support a finding of an 'extreme limitation' in balance while standing or walking" under Section 11.00D2); *Pritt v. Comm'r of Soc. Sec.*, No. 1:21-cv-1728, 2022 WL

---

[3] Mr. Smith does not argue that he has an extreme limitation in his ability to use his upper extremities.

19

2135304, at *11 (N.D. Ohio June 14, 2022) ("although the record documents [plaintiff's] use of a *single* cane, he has pointed to no evidence indicating that he used *two* canes, *two* crutches, or a walker") (emphasis in original); *see also Forrest*, 591 F. App'x at 366 (ALJ's alleged error at Step Three was harmless with respect to Listing 1.04 where "[t]he record shows that [plaintiff] used one cane at most, often went without, and could otherwise ambulate effectively during the relevant period").

Because there is no evidence that Mr. Smith requires the assistance of another person, a walker, two crutches, or two canes to stand from a seating position or balance while standing or walking, he has not raised a substantial question regarding whether he satisfies the elements of Listing 11.14, and the ALJ's failure to address the listing was harmless error.

In addition, even where an ALJ does not include a detailed analysis at Step Three, a court should affirm so long as the ALJ "made sufficient factual findings elsewhere in his decision to support his conclusion at step three." *Forrest*, 591 F. App'x at 366; *see also Tate*, 2018 WL 3417308 at *14 (holding that ALJ's failure to analyze listing at Step Three was harmless where ALJ made sufficient factual findings elsewhere to support Step Three conclusions).

Here, the ALJ made sufficient factual findings elsewhere to support the conclusion that Mr. Smith's peripheral neuropathy did not meet or equal Listing 11.14. The ALJ analyzed Mr. Smith's peripheral neuropathy at Step Four, specifically noting the degenerative findings at L5-S1 of his lumbar spine and the likelihood that his neuropathy was caused by alcohol abuse. (Tr. 24). The ALJ also noted treatment records indicating that Mr. Smith was not using his cane despite fear of falling, was able to walk to his father's home without a cane in 2017, and could walk unassisted, though not on his toes and heels. (Tr. 23-25). The ALJ further noted that, at an orthopedic visit in the Summer of 2020, Mr. Smith "was noted to have a normal gait, as well as intact strength and sensation." (Tr. 25). Finally, the ALJ noted that Mr. Smith reported being able

to drive, attend to household chores, perform light cooking, mow the lawn with a riding mower, and occasionally shovel snow. (Tr. 28). Those findings provide sufficient support for the ALJ's conclusion at Step Three that Mr. Smith did not meet or equal any listed impairment and are sufficient to support a finding that Mr. Smith did not satisfy Listing 11.14 in particular. Mr. Smith's first assignment of error is therefore without merit.

### 2. *The ALJ's Weighing of Medical Opinions*

Mr. Smith also argues that the ALJ failed to properly weigh the opinion evidence of three of his treating sources: Dr. Patti, Nurse Martin, and Mr. Adolph. Mr. Smith acknowledges that the ALJ was not bound to accept the opinions of his treating providers, but argues that the ALJ did not give sufficient reasons for rejecting their opinions.

On January 18, 2017, the SSA amended the rules for evaluating opinion evidence. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The revisions, which apply to all claims filed on or after March 27, 2017, eliminate the so-called "treating physician rule," pursuant to which an ALJ was required to give controlling weight to a treating physician's opinion absent good reasons to the contrary. *See* 20 C.F.R. § 404.1527; *Merrell v. Comm'r of Soc. Sec.*, 1:20-cv-769, 2021 WL 1222667, at *6 (N.D. Ohio Mar. 16, 2021), *report and recommendation adopted*, 2021 WL 1214809.

Under the revised regulations, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). However, the ALJ must "articulate how [the ALJ] considered the medical opinions and prior administrative medical findings . . . ." 20 C.F.R. § 404.1520c(a); *see also Creter v. Saul*, No. 1:20-cv-00840, 2021 WL 809323, at *10 (N.D. Ohio Mar. 3, 2021) ("Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a

medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'") (citations omitted, alterations in original). While the revised regulations "demand less of an ALJ than the former rules," they " 'still require the ALJ to provide a coherent explanation for [the ALJ's] reasoning.'" *Skipper v. Comm'r of Soc. Sec.*, No. 1:21-CV-01237-JRA, 2022 WL 3142634, at *7 (N.D. Ohio July 15, 2022), *report and recommendation adopted*, 2022 WL 3139605 (quoting *Lester v. Saul*, No. 20-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020)).

The SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). As a result, the ALJ is "not required to articulate how [she] considered each medical opinion or prior administrative medical finding from one medical source individually." *Id*.  Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id*.

Section 404.1520c(c)(1) defines supportability as follows:

> The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

20 C.F.R. § 404.1520c(1). "In other words, the supportability analysis focuses on the

physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)).

Section 404.1520c(c)(2) defines consistency as follows:

> The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 404.1520c(c)(2).

### a.  Dr. Patti and Nurse Martin

Between September 2017 and July 2020, Dr. Patti and Nurse Martin provided several letters stating that Mr. Smith was unable to work due to his neuropathy, anxiety, and unsteady gait. (Tr. 1566, 2656, 2833, 2990). Each of the letters was short, consisting of only a single paragraph of three to four sentences. Dr. Patti and Nurse Martin did not cite to any records in support of their opinions and did not assess Mr. Smith's functional capacity in any detail. *Id*. The ALJ found that these opinions were "inherently neither valuable nor persuasive" because they were conclusory and did not contain any functional analysis or objective support. (Tr. 27). Accordingly, the ALJ stated that she would not "provide any analysis how such evidence was considered." *Id*.  And directly after making this statement, the ALJ also observed that "notably, at the appointment contemporaneous with Dr. Patti's letter, the claimant was able to walk unassisted, had 5/5 motor strength throughout, and had intact sensation."  *Id*.

The ALJ's treatment of those opinions was consistent with the governing regulations. 20 C.F.R. § 404.1520b(c)(i) provides that the issue of whether a claimant is disabled or unable to work is reserved to the Commissioner. Section 404.1520b(c) further provides that such statements are "inherently neither valuable nor persuasive," and that the ALJ "will not provide any analysis about how [she] considered such evidence in [her] determination or decision, even under §

404.1520c." *Id.*; *see also Graybill v. Kijakazi*, No. 5:20-CV-1658, 2022 WL 4483945, at *6 (N.D. Ohio Sept. 27, 2022) (holding that ALJ's alleged failure to sufficiently address opinion that plaintiff was disabled could not furnish basis for remand in light of Section 404.1520b(c)). While the ALJ did not directly cite Section 404.1520b(c), the language she used came directly from that provision, and the ALJ was clearly, and correctly, invoking Section 404.1520b(c).

Regardless, the ALJ's analysis sufficiently addressed the supportability and consistency factors of Section 404.1520c. The fact that Dr. Patti and Nurse Martin provided conclusory opinions with no functional analysis or objective support bears directly on whether their opinions were supportable, and ALJ was entitled to discount those opinions given the lack of evidentiary support. *See Lyons v. Kijakazi*, No. 1:20-cv-1567, 2022 WL 1064070, at *7 (N.D. Ohio Jan. 10, 2022), *report and recommendation adopted sub nom*, 2022 WL 610762 (holding that ALJ properly discounted medical opinion where treating physician "offers no supporting explanation in her opinion, nor does the doctor identify objective medical evidence to support the limitations assessed") (emphasis omitted).

Mr. Smith argues that, because Dr. Patti wrote his letter on July 23, 2020, the same day that he conducted an examination of Mr. Smith, Dr. Patti must have been basing his letter on the results of that examination. However, a plaintiff's "citations to treatment records not actually cited or identified by the medical source does not render an opinion 'supportable,' as the regulations specifically look to a medical source's own presentation of objective evidence and/or supporting explanations rather than a claimant's *post hoc* presentation." *Lyons*, 2022 WL 1064070 at *7. Dr. Patti did not state that he was basing his conclusion on the examination that he performed on July 23, 2020, and I will not assume that he was necessarily doing so.

Moreover, as set forth above, the ALJ also found that Dr. Patti's assessment was inconsistent with at least portions of his July 23, 2020 examination because Mr. Smith had intact

sensation, 5/5 motor strength, and did not need assistance to walk. (Tr. 27, 3025). The fact that Dr. Patti's contemporaneous examination arguably contradicted portions of his opinion is relevant to the consistency of his opinion under Section 404.1520c2. *See Merrell*, 2021 WL 1222667 at *7 (holding that ALJ's decision to discount weight given to opinion from treating physician was supported by substantial evidence where opinion was inconsistent with evidence in the record); *Creter*, 2021 WL 809323 at *11 (holding that ALJ did not err where ALJ specifically cited treatment records ALJ believed were inconsistent with treating physician's opinion and explained why).

And while the ALJ's discussion does not "fit neatly into the 'first assess consistency and supportability, then consider other factors' framework that the post-March 27, 2017 regulation provide, the regulations do not require the ALJ to issue a perfect decision." *Merrell*, 2021 WL 1222667 at *6 (citation omitted); *see also Lawrence v. Comm'r of Soc. Sec.*, No. 1:21-CV-01691-JG, 2023 WL 2246704, at *20 (N.D. Ohio Jan. 19, 2023), *report and recommendation adopted*, 2023 WL 2242796 ("Although the ALJ did not use the term supportability or consistency . . . the ALJ made findings relative to the opinion related to supportability and consistency.").

Mr. Smith further argues that the record as a whole supports the conclusions of Dr. Patti and Nurse Martin. However, while there is evidence in the record supporting Mr. Smith's peripheral neuropathy, deficiencies in gait, difficulties in balance and standing, and use of a cane, the ALJ also cited substantial evidence supporting the conclusion that Mr. Smith is not disabled. As the ALJ noted, Mr. Smith reported not using his cane at various points and reported walking to his father's house in 2017 without a cane, which took him 40 minutes. (Tr. 23-25). In addition, Mr. Smith was able to walk unassisted in various examinations, though not on his toes and heels, and was assessed in 2020 as having intact strength and sensation. *Id*. Mr. Smith also reported being able to drive, attend to household chores, perform light cooking, mow the lawn with a riding

25

power, and occasionally shovel snow. (Tr. 28).

Significantly, and as the ALJ expressly noted, there is also recent evidence in the record indicating that Mr. Smith was actively looking for work and was refraining from taking a job, at least in part, due to fears that working would impact his disability claim. In 2019 and 2020, Mr. Smith: reported to his therapist at Harbor that he wanted to work but that his lawyer had advised Mr. Smith not to because he was appealing his disability determination; asked how much he could work without affecting his disability claim; reported that he had applied for jobs within walking distance; and proposed working under the table to avoid compromising his eligibility for benefits. (Tr. 26, 28, 2848, 2879, 2883, 2954). In light of such evidence, the ALJ did not err in discounting the opinions of Dr. Patti and Nurse Martin that Mr. Smith was unable to work.

### b. Mr. Adolph

Mr. Adolph performed a functional capacity evaluation of Mr. Smith on August 21, 2018, concluding that Mr. Smith suffered from significant dysfunction secondary to alcohol-induced peripheral neuropathy. (Tr. 2392). Mr. Adolph determined that Mr. Smith could sit without interruption, but that after sitting for more than 30 minutes it was very difficult for Mr. Smith to rise and get his legs moving. *Id*. Mr. Adolph also determined that Mr. Smith could stand for up to 30 minutes at a time with support, for a total of one hour per workday. *Id*. Mr. Adolph further determined that Mr. Smith could walk up to 200 feet at a time with a straight cane, for a total of 1,000 feet per workday. *Id*. Mr. Adolph opined that Mr. Smith's use a cane was medically necessary, and that Mr. Smith could carry very small, safe objects of nominal weight while using a cane. *Id*. Mr. Adolph opined that Mr. Smith has severe limitations in functional mobility and balance, which, when combined with Mr. Smith's fall risk, would continue to impede Mr. Smith's ability to function productively and/or safely in any time of work environment or dynamic community environment. (Tr. 2393). Mr. Adolph also opined that Mr. Smith is "currently not

employable in my opinion." *Id*.

The ALJ found Mr. Adolph's opinion "unpersuasive." (Tr. 27). The ALJ found that Mr. Adolph's statement that Mr. Smith was unemployable was a determination reserved to the Commissioner such that Mr. Adolph's statement was not entitled to special significance. (Tr. 27). For the reasons discussed above, that determination was proper pursuant to Section 404.1520b(c).

The ALJ further found that Mr. Adolph's evaluation "was not entirely consistent with the totality of the evidence." *Id*. While the ALJ did not specify which portions of the evidence she believed were inconsistent with Mr. Adolph's evaluation, that statement came after the ALJ spent five single-spaced pages recounting Mr. Smith's medical history. (Tr. 22-26). That was sufficient to satisfy the consistency prong. *See Merrill*, 2021 WL 1222667 at *7 (holding ALJ's statement that doctor's opinions "do not adequately reflect the claimant's functioning in [the relevant] period" was sufficient to support consistency element where ALJ also summarized other medical evidence in description of medical record) (N.D. Ohio Mar. 16, 2021); *Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, *8 (N.D. Ohio Sept. 30, 2021) ("Although it would enhance the ALJ's decision to include specific record citations following such a conclusion, the Court reads the underlying decision as a whole. In this case, the ALJ's assessment of [the doctor's] opinion came after the ALJ detailed Plaintiff's medical history over three-plus single space pages.")

The ALJ also found that Mr. Adolph's evaluation "fails to reveal the type of significant clinical abnormalities one would expect if the claimant was as limited as Mr. Adolph asserts." (Tr. 27). Mr. Smith takes issue with that determination, arguing that the ALJ failed to explain what clinical findings Mr. Adolph would have needed to make. While it would have been better for the ALJ to specify the clinical abnormalities she would have expected, a reviewing court reads an ALJ's decision, and the ALJ's treatment of medical opinions, as a whole. *See Taylor*, 2021 WL 4477865 at *8. Given the ALJ's detailed summary of Mr. Smith's medical records and evidence

27

that Mr. Smith's lack of employment may have been motivated, at least in part, by a desire to preserve his right to benefits, the ALJ did not commit reversible error in her treatment of Mr. Adolph's opinion.

## VI.     RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the ALJ's decision.

Dated: March 13, 2023

*/s Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions
   *Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the

nited States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).